In re: ASSICURAZIONI GENERALI
S.P.A. HOLOCAUST INSURANCE
LITIGATION

This Disposition Applies to All Actions.

No. MDL 1374.
No. M21–89 (MBM).

United States District Court,
S.D. New York.

Sept. 25, 2002.

Robert A. Swift, Joanne Zack, Kohn, Swift & Graf, P.C., Philadelphia, PA, Edward D. Fagan, Fagan & Associates, Livingston, NJ, Lawrence Kill, Linda Gerstel, Anderson Kill & Olick, P.C., New York, NY, for Cornell and Smetana Plaintiffs.

Nancy Cohen, Reynold L. Siemens, Stephen N. Goldberg, Heller Ehrman White & McAuliffe, Los Angeles, CA, for Smetana Plaintiffs.

Elizabeth J. Cabraser, Morris A. Ratner, Caryn Becker, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, NY, Melvyn I. Weiss, Deborah M. Sturman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for Schenker Plaintiffs.

William M. Shernoff, Jeffrey Issac Ehrlich, Douglas M. Carasso, Evangeline F. Garris, Shernoff Bidart & Darras, Claremont, CA, Lisa Stern, The Law Office of Lisa Stern, Los Angeles, CA, for Brauns, Mandil, Szekeres, Lightner, and Sladek Plaintiffs.

Thomas R. Fahl, Whyte Hirschboeck Dudek S.C., Menomonee Falls, WI, for Plaintiff David David.

Joseph P. Garland, Edward J. Klein, Jay Solomon, Klein & Solomon, LLP, New York, NY, Mel Urbach, Law Offices of Mel Urbach, Jersey City, NJ, for Plaintiff Maurice Tabaksman.

Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL, for Weiss Plaintiffs.

Franklin B. Velie, Dierdre A. Bergman, A. John P. Mancini, Salans Hertzfeld Heilbronn Christy & Veiner, New York, NY, M. Scott Vayer, Law Offices of M. Scott Vayer, New York, NY, for Defendant Assicurazioni Generali S.p.A.

Robert M. Raives, David D. Howe, Holland & Knight LLP, New York, NY, for Defendant Zurich.

## OPINION AND ORDER

MUKASEY, District Judge.

In twelve different actions currently before the court, plaintiffs sue European insurance companies that issued policies in about a dozen countries from 1920 to 1945.[1] It is alleged that those companies

---

**1.** Two actions were initially filed in this court: *Cornell, et al. v. Assicurazioni Generali S.p.A.,* 97 Civ. 2262 (class action); and *Schenker, et al. v. Assicurazioni Generali S.p.A., et al.* (formerly *Winters, et al. v. Assicurazioni Generali, et al.*), 98 Civ. 9186 (class action). Nine actions were transferred to this court by the

refused to pay benefits to policy beneficiaries or their surviving family members following the death of the policy holders or damage to their property during the German campaign of genocide before and during World War II, known as the Holocaust.

Assicurazioni Generali S.p.A. ("Generali"), a defendant in all actions, moves· to dismiss on the grounds of *forum non conveniens* and contractual forum selection. Zurich Life Insurance Company and Zürich Versicherungs–Gesellschaft (collectively "Zurich"), defendants only in the *Schenker* action, also move to dismiss on the ground of *forum non conveniens*. Both Generali and Zurich argue· that the balance of conveniences requires litigation in either: 1) the International Commission on Holocaust Era Insurance Claims ("ICHEIC"), a private commission set up by several European insurance companies, governmental entities, and nongovernmental organizations to resolve unpaid Holocaust-era insurance claims; or 2) the courts of the European countries in which the relevant insurance policies were issued. Generali additionally argues that applicable forum selection clauses mandate litigation of plaintiffs' claims in Europe. For the reasons set forth below, Generali's and Zurich's motions to dismiss are denied with respect to all plaintiffs.

## I.

◼ In considering a motion to dismiss on the ground of *forum non conveniens*, a court must first determine the level of deference to be given plaintiff's choice of forum. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir.2001) (*en banc*). Once that level is determined, the court must consider whether an adequate alternative forum exists. *Id.* If so, the court must weigh the relative convenience of the forums by examining the private and public interest factors set out by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), *Koster v.(Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 531–32, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). "[T]he greater the degree of deference to which the plaintiff's choice of forum is entitled, the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74.

The level of deference to be afforded a plaintiff's choice of forum is a question that has been the subject of much recent jurisprudence in the Second Circuit. *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21 (2d Cir.2002) ("*DiRienzo II*"); *Iragorri*, 274 F.3d at 69; *DiRienzo v. Philip Servs. Corp.*, 232 F.3d 49 (2d Cir.2000) ("*DiRienzo I*"); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir.2000); *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142 (2d Cir.2000). In DiRienzo I, *Wiwa*, and *Guidi*, the Circuit suggested that whenever a U.S. plaintiff files suit in a

Panel on Multidistrict Litigation ("MDL Panel") under Docket No. 1374: *Brauns v. Assicurazioni Generali, S.p.A., et al.*, 00 Civ. 9412; *Smetana, et al. v. Assicurazioni Generali, S.p.A., et al.*, 00 Civ. 9413 (class action); *Mandil v. Assicurazioni Generali, S.p.A., et al.*, 00 Civ. 9414; *Weiss, et al. v. Assicurazioni Generali, S.p.A., et al.*, 00 Civ 9415; *David v. Assicurazioni Generali, S.p.A.*, 00 Civ. 9416; *Szekeres, et al. v. Assicurazioni Generali, S.p.A., et al.*, 01 Civ. 0158; *Lightner v. Assicurazioni Generali, S.p.A., et al.*, 01 Civ. 0160; *Sladek v. Assicurazioni Generali, S.p.A., et al.*, 01 Civ. 6193; and *Haberfeld, et al. v. Assicurazioni Generali, S.p.A., et al.*, 01 Civ. 9498 (class action). A tenth such action, *Brygart v. Assicurazioni Generali, S.p.A., et al.*, 01 Civ. 0159, has been discontinued. One other action was removed to this court from New York State Supreme Court: *Tabaksman v. Assicurazioni Generali S.p.A.*, 01 Civ. 7826.

U.S. forum, that choice is to be considered the plaintiff's "home forum," and therefore entitled to great weight—even if that forum is a district other than the district in which the plaintiff resides. *See DiRienzo I*, 232 F.3d at 60–63; *Wiwa*, 226 F.3d at 101–03; *Guidi*, 224 F.3d at 145–48. A divided panel in *DiRienzo I* held this level of deference to be undiminished by the fact that the U.S. plaintiffs may be acting in a representative capacity as part of a shareholder class action, at least where the majority of the plaintiff class were American residents. *See DiRienzo I*, 232 F.3d at 60–62. *But see DiRienzo I*, 232 F.3d at 72–79 (Cabranes, J., dissenting).

 In order to elucidate the principles established in those recent opinions, the Second Circuit in *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir.2001), sitting *en banc*, fashioned a "sliding scale" approach to determine the appropriate deference to be given to a plaintiff's choice of forum. *Id.* at 71. According to that scale, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States," the more deference will be accorded plaintiff's choice of a U.S. forum, and "the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*" *Id.* at 72 (footnotes omitted). To help guide future analysis, the Court identified the following factors as examples of factors that militate against *forum non conveniens* dismissal:

the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense.

*Id.* On the other hand, the Court stated that *forum non conveniens* dismissal will be most appropriate where:

plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons— such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum.

*Id.*

 In the actions currently before the court, three distinct plaintiff groups are present. *See supra* note 1. The first plaintiff group consists of the plaintiffs in the *Cornell* and *Schenker* class actions, who filed their class-action complaints in this court in the first instance. Of the named *Cornell* plaintiffs, two live in New York, one lives in Texas, and one lives in California. (*Cornell* Second Am. Compl.) Of the named *Schenker* plaintiffs, two are residents of New Jersey, two are residents of Florida, and one is a resident of California. (*Schenker* Corrected Am. Compl.) Both the *Cornell* and *Schenker* class action complaints were recently amended to exclude all claims against German Corporations in accordance with the German Foundation settlement between the German and American governments. *See infra* p. 11–12 & n. 6. Prior to those amendments, 22 of the 39 named plaintiffs in the *Cornell* and *Schenker* actions were residents of New York. (*Cornell* Am. Compl.; *Winters* Compl.)

There appears to be no reason to doubt the bona fides of the *Cornell* and *Schenker* plaintiffs' choice of a U.S. forum: every single named plaintiff is a U.S. resident, and litigation abroad would likely raise costs and necessitate the retention of for-

eign counsel. Furthermore, plaintiffs' choice of this particular U.S. forum was likely motivated by their legitimate desire to litigate close to their residences. Twenty-two of the original 39 named plaintiffs were from New York, with the other 17 plaintiffs scattered around the country; even for the current group of named plaintiffs, New York is a convenient forum, with four of the nine plaintiffs living in New York or New Jersey, and the other five plaintiffs geographically scattered. Furthermore, "[o]utside of Israel, New York is home to the largest number of Holocaust survivors and their heirs in the world," N.Y. Holocaust Victims Insurance Act of 1998 ("HVIA") § 2, N.Y. Ins. Law § 2701 notes (McKinney 2000), which suggests that whomever the unnamed plaintiff class or classes ultimately include, a substantial portion will consist of New York residents.

It does not appear that the *Cornell* and *Schenker* plaintiffs have brought suit in this forum merely to inconvenience defendants. Although the parties have not presented evidence as to where else Generali and Winterthur might be subject to suit, plaintiffs, having chosen a U.S. forum, have chosen a convenient one. Generali itself concedes as much, stating in its motion before the MDL panel to consolidate the present actions in this district: "New York is the most convenient forum to litigate the issues in the United States, as it is the home of Generali's United States Branch, Generali's counsel, and several of the firms representing plaintiffs." (Swift Decl. Ex. E (Generali Mot. for Transfer of 8/11/00 at 6)) The fact that defendants currently do extensive business in New York and in this country belies any argument that defendants would be litigating in an unduly hostile or unfamiliar environment. Given plaintiffs' legitimate reasons for bringing suit in this forum, and given defendants' representations to the MDL panel, plaintiffs' choice of forum is entitled to strong deference under the Circuit's sliding-scale approach in *Iragorri*. See *DiRienzo II*, 294 F.3d at 28–29. Such deference is due notwithstanding the fact that plaintiffs are acting in a representative capacity. *Id.*[2]

The second plaintiff group present in this action consists of the *Brauns, Mandil, Weiss, David, Szekeres, Lightner,* and *Sladek* plaintiffs and the named and unnamed plaintiffs in the *Haberfeld* and *Smetana* class actions—all of whom originally filed their lawsuits in their home forums, but whose cases have since been transferred to this district after Generali's successful motion before the MDL panel.[3] These plain-

---

**2.** In a dissent in *DiRienzo I*, Judge Cabranes suggested that plaintiffs suing in a representative capacity should be entitled to lesser deference because there is no true "home forum" in such a scenario. *DiRienzo I*, 232 F.3d at 72–79. This view echoed the position that I had taken in the district court opinion in that case. *In re Philip Sevs. Corp. Sec. Litig.*, 49 F.Supp.2d 629, 634 (S.D.N.Y.1999). After rehearing of the case after the Second Circuit's *en banc* opinion in *Iragorri*, all members of the panel in *DiRienzo I* agreed that plaintiffs' choice of forum should have be given strong deference in light of their legitimate reasons for bringing suit in the forum under the *Iragorri* factors. *DiRienzo II*, 294 F.3d at 28–29; *Id.* at 34 (Cabranes, J., concurring in part and dissenting in part).

**3.** The plaintiffs in *Brauns, Mandil, Szekeres, Lightner, Sladek, Smetana,* and *Haberfeld* originally brought suit in California Superior Court. Their cases were subsequently removed to the United States District Courts for the Northern, Central, and Southern Districts of California, and then transferred to this district by the MDL panel. In *David,* plaintiff originally filed suit in the United States District Court for the Eastern District of Wisconsin; his case was also transferred to this district by the MDL panel. In *Weiss,* plaintiffs originally filed suit in Florida state court; the case was removed to the United States District Court for the Southern District of Florida and then transferred to this district by the MDL panel.

tiffs are not only U.S. residents who seek a U.S. forum, but they are also U.S. residents who originally sought to litigate in their home district within the United States.[4] According to *Koster*, a resident's choice to sue in his or her home forum is generally entitled to great deference. *See Koster*, 330 U.S. at 524, 67 S.Ct. 828; *Iragorri*, 274 F.3d at 71. Such deference is not diminished because defendant has forced plaintiffs to litigate in a different forum by effecting a transfer before the MDL panel. *See DiRienzo II*, 294 F.3d at 28–29 (noting the importance of defendants' motions before the MDL panel in the *Iragorri* analysis); *In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 296 (E.D.N.Y.2002) (same). This deference is not diminished by the class-action status of the *Smetana* and *Haberfeld* actions. *See DiRienzo II*, 294 F.3d at 28–29.

The third and last plaintiff group present in this action consists solely of plaintiff *Tabaksman*, a British citizen living in Britain who filed suit in New York State Supreme Court. His case was subsequently removed to this district. Tabaksman's asserted justification for bringing his suit in New York is that his claim is "substantially the same as those asserted in the putative class action also pending in this Court." (Tabaksman Mem. at 1) He claims that "[i]f the Court denies the motions to dismiss the other Generali cases, there will be no additional burden to Generali in defending against Tabaksman's claim in this Court." (*Id.* at 4) However, the fact that other related actions are pending in a given district court in the United States is not a factor in the *forum non conveniens* analysis used to determine

the appropriate level of deference in *Iragorri*. Tabaksman does not live in the United States, he is not a U.S. citizen, and if he testifies as a witness, it will be inconvenient for him to travel here from Britain. In short, he has no bona fide connection to the forum. His decision to file his own individual lawsuit in this district is therefore entitled to little deference.

The court thus accords great deference to all plaintiffs' choices of forum, except for plaintiff Tabaksman. As for those plaintiffs entitled to strong deference, defendants must make a strong showing of inconvenience in order to prevail. *See Iragorri*, 274 F.3d at 74–75.

## A. Forum Non Conveniens Dismissal in Favor of ICHEIC

■ Both Generali and Zurich first argue that this court should dismiss plaintiffs' claims on the ground of *forum non conveniens* in favor of the International Commission on Holocaust Era Insurance Claims ("ICHEIC"). Because ICHEIC is not an adequate alternative forum for the litigation of plaintiffs' claims, defendants' *forum non conveniens* motions are denied with respect to ICHEIC.

### 1. Background

ICHEIC is a privately funded, non-profit entity that was created pursuant to an August 25, 1998 Memorandum of Understanding ("MOU") among six European insurance companies—Alianz Lebensversicherungs–AG of Germany; AXA of France; Basler Lebens–Versicherungs–Gesellschaft,[5] Winterthur, and Zurich of Switzerland; and Generali of Italy—along

---

**4.** There are two minor caveats to this statement. In the *Szekeres* action, one plaintiff is a resident of California (where the action was brought), but the other plaintiff is a resident of New York. In *Weiss*, one plaintiff (Weiss) is a resident of Florida (where the action was

brought), but the other two plaintiffs—for whom Weiss has the power of attorney—are residents of New York and Ohio respectively.

**5.** Basler withdrew from ICHEIC in January 1999.

with certain nongovernmental Jewish organizations, the State of Israel, and certain U.S. state insurance regulators. (Weiss Mem. Ex. Q; Velie Decl. Ex. A; Velie Rep. Decl. of 1/8/02 Ex. F) ICHEIC's mission is to resolve unpaid Holocaust-era insurance claims through a formal claims and valuation procedure that serves as an alternative to litigation in the U.S. courts. (Weiss Mem. Ex. Q at 2, 7–8; Velie Decl. Ex. B) The commission is chaired by former U.S. Secretary of State Lawrence Eagleburger. (Velie Rep. Decl. of 1/8/02 Ex. F at 1) ICHEIC's funding has thus far come from its six founding insurance companies, which pledged a collective $90 million to ICHEIC; as of now, $30 million of that money has been delivered. (Weiss Mem. Ex. Q at 14) On November 16, 2000, Generali contributed an additional $100 million to ICHEIC as part of a "global settlement with ICHEIC and the Jewish and Israeli representatives." (*Id.*; Velie Decl. Ex. V; Carnicelli Decl. of 1/9/02 ¶ 4)

It is anticipated that the ICHEIC claims and valuation process will ultimately be used to process not only claims against its current member companies, but also claims against various German insurers in connection with the July 17, 2000 executive agreement between the United States and the Federal Republic of Germany creating the Foundation for Remembrance, Responsibility and the Future ("the German Foundation"). (Velie Rep. Decl. of 1/8/02 Ex. F at 8–9) In that agreement, the German government and representatives of German industry agreed to fund the German Foundation in the amount of DM 10 billion (roughly $5 billion) in exchange for "legal closure" with respect to all Holo-caust-related claims, including insurance claims, against German companies in the United States legal system.[6] (Velie Decl. Exs. G, U; Velie Rep. Decl. Ex. F at 8–9) The agreement calls for the German Foundation to allocate up to DM 650 million (roughly $325 million) to ICHEIC for the resolution of unpaid insurance claims against German companies, and states that all insurance payments are to be made in accordance with ICHEIC's claims and valuation procedures. (*Id.*) The German Foundation has not yet delivered the promised funding because the Foundation and ICHEIC are currently at loggerheads over various administrative matters. (Weiss Mem. Ex. Q; Swift Decl. Exs. B, C)

ICHEIC, defendants point out, offers several advantages to plaintiffs that make it preferable to litigation in the U.S. courts. First, ICHEIC uses a currency formula that values all relevant currencies at the exchange rate in effect at the end of 1938, before hyperinflation destroyed many European currencies. (Velie Decl. ¶ 5, Ex. B) In addition, ICHEIC's procedural rules incorporate relaxed standards of proof, which make it easier for plaintiffs to introduce evidence relating to insurance policies that were issued many years ago. (Velie Decl. ¶ 4, Ex. Z) Furthermore, the member insurance companies of ICHEIC have waived many of their legal defenses to plaintiffs' claims, eliminating many of the obstacles that plaintiffs would face in ordinary litigation. (Velie Rep. Decl. of 1/8/02 Ex. P at 2; Generali Mem. of 5/25/01 at 3, 27) Finally, ICHEIC features a global advertising and outreach program

---

**6.** To effect legal closure, the U.S. Department of Justice is obligated to file a "Statement of Interest" in all cases involving Holocaust-era claims against German companies, expressing the view that the German Foundation is the exclusive forum for those claims and that dismissal is required in keeping with the for-eign policy interests of the United States. (Velie Decl. Ex. U at 3–4) For a more detailed description of the genesis and operation of the German Foundation, see *In re Nazi Era Cases Against German Defendants Litig.*, 129 F.Supp.2d 370, 378–81 (D.N.J.2001).

and toll-free telephone numbers with assistance available in numerous languages. (Velie Decl. ¶ 4, Ex. S; Velie Rep. Decl. of 1/8/02 Exs. S, U) The independence of ICHEIC is ensured through an independent auditing process and a right to appeal the Commission's ruling to an independent arbitrator or panel of arbitrators. (Velie Decl. ¶ 6, Ex. T)

### 2. ICHEIC is Not an Adequate Alternative Forum

In order to establish that an alternative forum is adequate, defendants ordinarily must demonstrate only that the they are amenable to service of process in that forum. *See Piper Aircraft,* 454 U.S. at 255 n. 22, 102 S.Ct. 252; *Aguinda v. Texaco, Inc.,* 303 F.3d 470, 476–77 (2d Cir.2002); *Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 981 (2d Cir.1993). In this case, it is not disputed that Generali and Zurich are subject to service of process in ICHEIC; in fact, ICHEIC was expressly created in order to provide a forum in which insurance claims could be brought against its member insurance companies. Nonetheless, "[i]n rare circumstances ... where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Piper Aircraft,* 454 U.S. at 255 n. 22, 102 S.Ct. 252, *quoted in Aguinda,* 303 F.3d at 477–78. This case involves such "rare circumstances." Defendants have moved to dismiss in favor of a private, nongovernmental forum that they both created and control, the continued viability of which is uncertain. Because of these shortcomings, ICHEIC cannot be considered an adequate alternative forum.

In a more traditional *forum non conveniens* motion, the court would be asked to dismiss in favor of another nation's courts and would have to determine whether that nation's courts provide an adequate alternative forum. In such cases, American courts have understandably been quite reluctant to declare another forum inadequate. *See, e.g., PT United Can Co. Ltd. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998) ("[C]onsiderations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare." (citation omitted)); *Blanco,* 997 F.2d at 981 ("[W]e have repeatedly emphasized that '[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.'" (quoting *Chesley v. Union Carbide Corp.,* 927 F.2d 60, 66 (2d Cir.1991) (citation omitted) (internal quotation marks omitted))).

Such deference to the legal processes of foreign nations extends even to nonjudicial forums that are part of the administrative apparatus of sovereign states. For example, two Courts in this Circuit have dismissed actions in favor of nonjudicial liquidation proceedings in foreign countries on the basis of comity. *See Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240 (2d Cir.1999); *Allstate Life Ins. Co. v. Linter Group, Ltd.,* 994 F.2d 996 (2d Cir. 1993). In addition, at least two U.S. Courts, in dismissing an action on the ground of *forum non conveniens,* have determined that New Zealand's administrative accident compensation system constitutes an adequate alternative forum. *See Lueck v. Sundstrand Corp.,* 236 F.3d 1137, 1143–45 (9th Cir.2001); *In re Silicone Gel Breast Implants Products Liability Litig.,* 887 F.Supp. 1469, 1475–76 (N.D.Ala.1995). Similarly, another Court has ruled, in deciding a *forum non conveniens* motion, that Saudi Arabia's quasi-judicial Legal Medical Commission constituted an adequate alternative forum for plaintiffs' medical negligence claims. *See Jeha v. Arabian Am. Oil Co.,* 751 F.Supp. 122, 125–26 (S.D.Tex.1990). Apparently,

medical malpractice claims in Saudi Arabia are "regularly handled" by that commission, and the commission is chaired by a judge appointed by the Minister of Justice. *Id.* at 125.

However, ICHEIC—an ad-hoc, nonjudicial, private international claims tribunal—is not entitled to the same deference as the courts or an administrative arm of a foreign sovereign nation. No comity concerns are implicated by a rigorous analysis of ICHEIC's adequacy; in fact, greater scrutiny of ICHEIC is warranted because the commission, as a nongovernmental entity, comes with fewer indicia of reliability than the courts of a sovereign nation. That several United States state insurance commissioners and the State of Israel are founding members of ICHEIC, and that the insurance departments of several states have endorsed ICHEIC (Generali Rep. Mem. of 1/9/02 at 10–11), does not make ICHEIC a "governmental" forum. To the contrary, ICHEIC—in its own publications—describes itself as "a *private*, non-profit entity organized as an Association . . . under the Swiss Civil Code" (Velie Rep. Decl. of 1/8/02 Ex. F at 1 (emphasis added)). A private, nonprofit association is not entitled to the deference that is accorded a public adjudicative or administrative organ of a sovereign state.

█ Because of its private status, it is not clear that a nongovernmental forum such as ICHEIC can ever constitute an adequate alternative forum for the purposes of *forum non conveniens*. When a plaintiff brings a claim before a govern-

mental body, that plaintiff has chosen to litigate his or her claim in a public forum rather than before a private arbitrator or private international commission. I am skeptical that the doctrine of *forum non conveniens* can be used to undo that decision. The doctrine of *forum non conveniens* is appropriately used as a tool to force plaintiffs to litigate in a more convenient public forum, but it cannot be used to throw a plaintiff out of court and into a private dispute-resolution mechanism. Although a defendant may properly move to compel arbitration based on a contract, or to dismiss in favor of an international commission pursuant to a statute or executive agreement,[7] it is a radical departure from usual *forum non conveniens* analysis to suggest that a defendant could move to compel plaintiffs' appearance before some private forum merely because the balance of conveniences might favor it. It is fundamentally plaintiffs' prerogative to choose either litigation in a public forum, or private dispute resolution. For that reason alone, defendants' motion to dismiss should not be granted.

However, even if a private, nongovernmental forum could under certain circumstances be an adequate alternative forum for the purposes of *forum non conveniens*—a possibility that I do not entirely foreclose—ICHEIC is manifestly inadequate because it lacks sufficient independence and permanence. ICHEIC is entirely a creature of the six founding insurance companies that formed the Commission, two of which are defendants

---

7. A plaintiff may constitutionally be compelled to try his claims in an international tribunal pursuant to an executive agreement between the United States and a foreign nation. *See Dames & Moore v. Regan,* 453 U.S. 654, 675–689, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (upholding President Reagan's suspension of claims against Iran in U.S. courts and his funneling of those claims into the Iran–United States Claims Tribunal, pursuant to an

executive agreement); *In re Nazi Era Cases,* 129 F.Supp.2d at 374–88 (dismissing plaintiff's slave-labor claims against German corporations on political-question grounds and on the ground of comity, in light of the July 2000 German Foundation executive agreement between the United States and the Federal Republic of Germany). No executive agreement is implicated in this case.

in this case; it is in a sense the company store. Virtually all of ICHEIC's funding—not only for claims payments, but also for all administrative expenses— comes from those insurance companies. The concern that defendants could use their financial leverage to influence the ICHEIC process is not merely theoretical. In a memorandum attached to a November 6, 2001 letter to members of Congress, ICHEIC Chairman Lawrence Eagleburger expressed concern that $60 million of the $90 million that ICHEIC's founding insurance companies initially pledged to the commission was being withheld "as a 'form of punishment' for some decisions I have made with which the companies disagree." (Weiss Mem. Ex. Q at 14)

Not only is the commission financially dependent on Zurich and Generali, as well as its other founding members, but there are also indications that ICHEIC's decision-making processes are and can be controlled by the defendants in this case— Generali and Zurich—as well as the other ICHEIC member-insurance companies. Chairman Eagleburger has explained that ICHEIC operates only on the basis of "consensus" among its member companies. (Weiss Mem. Ex. Q at 1, 12–13) Indeed, Generali itself has echoed the view that the organization acts only by consensus, stating:

> [W]e regard ICHEIC as a creature of consensus. Participation in ICHEIC is voluntary by all concerned and none of its members, certainly not Generali, at any rate, has relinquished the right to acquiesce to, or dissent from, the views and positions taken by others, including a majority.
>
> . . . . .
>
> [W]e are not prepared to relinquish our right to reject any imposed solution which we might regard as unfair or unjust . . . .

(Weiss Mem. Ex. S) In a case in which a Court feared that the Chilean judiciary, after a miliary junta, might not be able to render an impartial decision in a case involving a state-owned corporation, the Court refused to dismiss on the ground of *forum non conveniens* and held that Chile was an inadequate alternative forum. *See Canadian Overseas Ores Ltd. v. Compania de Acero Del Pacifico S.A.*, 528 F.Supp. 1337, 1341–43 (S.D.N.Y.1982), *aff'd*, 727 F.2d 274 (2nd Cir.1984). The Court did not find, as a matter of fact, that the courts of Chile were not independent, but rather held that defendant had not met its burden of establishing Chile's adequacy. *Id.* at 1343. If even the courts of a sovereign state can be found wanting in guarantees of independence, how much more easily can a privately created entity such as ICHEIC be found so wanting, when it owes its very existence to interested parties.

Finally, there are questions about ICHEIC's continued viability as a forum. First, there seems to be nothing preventing ICHEIC's member corporations from leaving at any time; one corporation, Basler, has already withdrawn from the organization. (Weiss Mem. Ex. Q) In addition, many claimants who have participated in the ICHEIC claims resolution process have expressed dissatisfaction with that process. The Weiss plaintiffs point out that as of November 8, 2001, ICHEIC had made a total of only 797 offers for payment in response to over 77,000 claims (.35%), and that only 273 of those offers were accepted. (Weiss Mem. at 27, Ex. X) Plaintiffs point to several newspaper articles (Swift Decl. Exs. B, C) as well as letters and reports from public officials (Weiss Decl. Exs. N, R, T) decrying ICHEIC's excessive administrative expenses and failure to make sufficient progress in resolving Holocaust insurance claims. One newspaper article has de-

scribed ICHEIC as having "repeatedly been at the point of collapse since its inception in 1998" (Swift Decl. Ex. C. (citing *Financial Times* 7/18/01)), and one Court has recently noted that ICHEIC "may be in disarray" (Letter to the Court of Morris A. Ratner, Esq. of July 10, 2002) (citing *In re Nazi Era Cases Against German Defendants Litig.*, 129 F.Supp.2d 370 (D.N.J. 2002)). Chairman Eagleburger himself resigned from ICHEIC for a day on January 22, 2002 in frustration over the continuing negotiations with the German Foundation. (Eagleburger Decl. of 4/16/02 ¶ 5) It is true, as Chairman Eagleburger points out, that many of the problems associated with ICHEIC derive from tensions surrounding the German Foundation settlement, which do not directly involve either Zurich or Generali, which has demonstrated its good faith by recently contributing $100 million to ICHEIC. (*Id.* ¶¶ 4–5) Nonetheless, the instability surrounding the ICHEIC process is a concern that militates against dismissing the instant cases in favor of ICHEIC as an adequate alternative forum.

Because ICHEIC is an inadequate alternative forum for the litigation of plaintiffs' claims, it is unnecessary to consider whether the balance of conveniences favors litigation of plaintiffs' claims in ICHEIC. Indeed, because the *Gilbert* convenience factors need not be reached, Generali's observation that the United States government has several times expressed its view that ICHEIC "should be considered the exclusive remedy for resolving insurance claims from the World War II era" (Velie Decl. Exs. O, U, W, Y; Generali Mem. of 5/25/01 at 13) is irrelevant. Absent a statute or executive agreement suspending plaintiffs' claims or an executive agreement that gives rise to specific foreign relations concerns, *see supra* note 7, the

government's position is not controlling and speaks at most to the convenience of ICHEIC as a forum.[8] Similarly, Generali's $100 million settlement with ICHEIC is not dispositive because it is not a binding settlement between the parties and does not implicate the foreign policy interests of the United States.

In holding that ICHEIC is not an adequate forum for the purposes of defendants' *forum non conveniens* motions, the court does not intend to denigrate the work that defendants, Secretary Eagleburger, and the state insurance commissioners have put into crafting ICHEIC. I am mindful of the size of their task and the challenges they face. ICHEIC ultimately may be the most expeditious forum for the resolution of plaintiffs' Holocaust-era insurance claims. *See In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 174–75, 177–78 (S.D.N.Y. 2000) (noting the complexity, expense, duration, and risk of pursuing Holocaust-era claims through litigation), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir.2001); *see also In re Holocaust Victim Assets Litig.*, 105 F.Supp.2d 139, 148–49 (E.D.N.Y.2000) (cautioning that "strong moral claims are [not] easily converted into successful legal causes of action"). But whatever ICHEIC's virtues, and whatever the convenience of that forum relative to this court, plaintiffs have chosen to pursue their claims through litigation in a public forum. Unless and until defendants can convince plaintiffs that ICHEIC offers the best forum for resolution of their claims, it is not this court's place to force plaintiffs into a private nonjudicial forum created by defendants and subject to considerable uncertainties.

**8.** Generali acknowledges that it is not seeking "dismissal by reason of a Government Statement of Interest," but rather "seeks dismissal based on this Court's sound discretion to dismiss in favor of a more convenient forum." (Generali Rep. Mem. at 6).

## B. *Forum Non Conveniens in Favor of Various European Forums*

■ Generali and Zurich argue also that plaintiffs' claims should be dismissed, if not in favor of ICHEIC, then in favor of several more convenient European forums in the countries where the material events with respect to each plaintiff occurred. In support of their motions, defendants have submitted the affidavits of several foreign law experts who have expressed their view that each of Italy, Poland, the Czech Republic, Hungary, Austria, Slovakia, and Switzerland is an adequate alternative forum. (Fumagalli Decl.; Wisniewski Decls. of 5/23/01, 10/19/01, 12/21/01; Sodomka Decl.; Hajdu Decl.; Kodek Decl.; Havlat Decl.; Vischer Decls. of 11/20/97, 12/13/99, 7/15/99, 4/23/01; Velie Rep. Decl. of 1/8/02 Exs. K, L).

Given Generali's presence in all seven countries (Catalanotti Decl. of 5/23/01 ¶¶ 7, 16), and given the deference generally accorded the courts of foreign nations, *see* pp. 14–15, I assume without deciding that each of the above seven countries would offer an adequate alternative forum for the litigation of plaintiffs' claims. However, because defendants have not demonstrated that the balance of conveniences under the public and private interest factors weighs heavily in their favor, defendants have not overcome the strong presumption in favor of plaintiffs' choice of this forum. *See*

*Alfadda v. Fenn,* 159 F.3d 41, 46 (2d Cir. 1998) ("[D]ismissal usually is not appropriate unless 'the balance of convenience tilts strongly in favor of trial in the foreign forum.'") (quoting *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991)). Generali's and Zurich's motions to dismiss in favor of the above European forums therefore are denied.[9]

### 1. *The Private Interest Factors in Cases Other than* Tabaksman

The private interest factors in this case favor retention of jurisdiction in this court.[10] Litigation in this forum does present a number of legitimate obstacles for defendants arising from lack of access to documents and witnesses located in Europe and inability to implead third parties located abroad. However, forcing litigation of plaintiffs' claims in at least seven different European countries would likely increase the costs to both sides and impose such a great inconvenience on plaintiffs that it is doubtful they could continue to prosecute their claims.

a. *Evidentiary Concerns*—Defendants assert that most documents relevant to plaintiffs' claims are located in Europe, where the material events regarding plaintiffs' claims occurred. However, defendants' concerns are overstated, given the unavoidable need for transnational evi-

---

**9.** Because eleven of the twelve consolidated cases in this action involve named U.S. plaintiffs suing Generali or Zurich regarding policies issued in Europe, the balancing of the conveniences with respect to those plaintiffs, whose choice of forum is entitled to great deference, can be considered together. However, because plaintiff Tabaksman is a British citizen, the balancing of conveniences with respect to his case is analyzed separately in subsection (3) below.

**10.** The private interest factors to be examined in a *forum non conveniens* motion are as follows:

the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839. The *Gilbert* Court noted also that "[t]here may also be questions as to the enforcibility [sic] of a judgment if one is obtained." *Id.*

dence in this case and the abundant available means for collecting that evidence.

Only plaintiffs Marc Rubinstein and Henry Shery[11] have made claims against Zurich; those plaintiffs allege that family members living in Poland were denied insurance benefits. (*Schenker* Corrected Am. Compl. ¶¶ 9–10) Zurich states that to the extent that any documentary or testimonial evidence exists with respect to plaintiffs Rubinstein and Shery's claims, that evidence is located either at the company's headquarters in Switzerland or in the unspecified country where Rubinstein and Shery's policies were sold. (Landolt Decl. of 6/7/01 ¶¶ 7–11)

Most other plaintiffs have sued Generali with respect to policies that were sold in the following countries: Italy, Poland, Czechoslovakia, Hungary, Austria, Yugoslavia, and Latvia. (Catalanotti Decl. of 5/23/02 ¶ 135; Carnicelli Decl. of 1/9/02 ¶ 11; Velie Rep. Decl. of 1/8/02 Ex. K) Generali states that all original policies were held locally at branch offices throughout Europe. (Catalanotti Decl. of 5/23/02 ¶ 17) To the extent that those documents still exist, they are now "in the archives of the state-run insurance companies which took over Generali's branch offices after World War II." (*Id.* ¶ 21) Generali's headquarters office in Trieste, Italy also contains an abundance of relevant documents such as: 1) water copies (similar to a carbon copies) of the original insurance policies; 2) policy "abstracts" (typically in German) reproducing the key terms and conditions of the original policy; 3) copies of the General Terms and Conditions in effect when the relevant policies were issued; and 4)a statistical ledger called "stato fine," detailing the policies in force at the end of each year after 1936. (*Id.* ¶¶ 18–19) Generali speculates that any

witnesses who might have knowledge of the insurance claims at issue—mainly former or current employees of Generali or the state-run companies that took over its Eastern European branches—are located in Europe and do not speak English as their first language. (*Id.* ¶¶ 154–56)

Generali and Zurich contend that transfer of this evidence from Europe to this forum will be impossible because compulsory process here cannot compel the production of documents or witnesses under the control of Eastern European governments and state-run insurance agencies in those countries, and in any event, inconvenient and expensive, even were such process available. (Defs.' *Cornell* Mem. of 11/21/97 at 20–22; Defs.' *Winters* Mem. of 7/30/99 at 10; Defs.' *Winters* Rep. Mem. of 12/15/99 at 13) Furthermore, because the relevant documents will be written in—and the relevant witnesses will speak—European languages, defendants assert that the translation expenses associated with trial in this forum would be exorbitant. (*Id.*) Defendants note that even where witnesses can be deposed abroad through the Hague Convention on the Taking of Evidence Abroad, Mar. 18, 1970, 28 U.S.C. § 1781 (2000), 847 U.N.T.S. 231, this Circuit has expressed a preference for live witness testimony where possible. *See Alfadda*, 159 F.3d at 48; *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir.1978).

Defendants' evidentiary concerns are not without merit. *See Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 510 n. 10 (S.D.N.Y.1982) (Weinfeld, J.) (noting the importance of compulsory process); *id.* at 510 n. 11 ("The location of witnesses is always a key issue in a *forum non conveniens* inquiry."); *id.* at 510 (noting that the need for translation of the testimony of

---

11. Plaintiff Shery does not mention Zurich by name, but does assert a claim against "defen-

dants" generally.

foreign witnesses weighs in favor of dismissal); *Transunion Corp. v. Pepsico, Inc.*, 640 F.Supp. 1211, 1216 (S.D.N.Y. 1986) (Weinfeld, J.) (same), *aff'd*, 811 F.2d 127 (2d Cir.1987). However, as set forth below, defendants' concerns are overstated.

First, it is not uncommon in international litigation for documents or witnesses to be located abroad. As Judge Sterling Johnson recently observed in a case involving similar claims arising from the retention of Jewish assets by French banks during Holocaust era:

> [T]he advances of modern technology and the development of a global economy with instant access to information worldwide severely undercut defendants' claim of forum non conveniens. . . . The costs involved to defendants in defending this action in New York are significantly mitigated by the time-and money-saving tools including e-mail, fax, scanners, digital photography, and global access to the internet.

*Bodner v. Banque Paribas,* 114 F.Supp.2d 117, 133 (E.D.N.Y.2000) (citation omitted); *see also Am. Home Assurance Co. v. Ins. Corp. of Ireland, Ltd.,* 603 F.Supp. 636, 641 (S.D.N.Y.1984) ("Allegations by movants concerning greater access in Britain to documents, witnesses and evidence . . . even if true, do not amount to the 'extreme circumstances' and 'material injustice' needed to overcome the strong private interest of plaintiffs' choice of a domestic forum.").

Second, the need to tap international sources of evidence is plainly unavoidable in this litigation. Evidence in this case exists primarily in three locations: in the Eastern European countries where Generali's branch offices were located; at Generali and Zurich's headquarters in Trieste, Italy and Switzerland respectively; and in the hands of the named American plaintiffs in this action and the rest of the presumed plaintiff class. There is no reason to believe that any more of the evidence in this case will be located in Eastern Europe— where defendants seek to litigate—than anywhere else. In fact, the existence of any evidence at all in Eastern Europe is highly uncertain. Generali has expressed the belief that "the documents stored ·at certain of Generali's former European offices were completely destroyed or lost either as a result of the devastation of World War II or from the events following the war." (Catalanotti Decl. of 5/23/01 ¶ 21 & n. 3) It is also unclear who, if anyone, in Eastern Europe might have personal knowledge relevant to plaintiffs' claims, 70 years after most of the policies in question were issued. On the other hand, Generali is currently aware of millions of potentially relevant documents located in a warehouse in Trieste, and the evidence that has been produced from Generali thus far has come from Trieste. (*Id.* ¶¶ 152–53) Significant evidence is also located in this country, much of it in English, as many of the plaintiffs will likely proffer documents and testimony to buttress their claims.

To the extent that the millions of documents from Trieste are sought in European countries outside Italy, they will have to be transported and perhaps even compelled through international processes. Documents from Trieste that are relevant as a general matter to all actions would have to be reproduced six different times and translated into the various languages of each of the other European forums if this case were dismissed. Similarly, any European witness with information relating to all actions, such as Catalanotti of Generali, who has made a declaration in this case, would have to testify seven different times in seven different forums. Even if litigation were to occur in Italy or Switzerland, where the companies' headquarters are located, the parties still would

have to transport and perhaps compel documents and witnesses located in Eastern Europe and the United States.

The international implications of this litigation are unavoidable and, therefore, the Hague Convention on the Taking of Evidence Abroad, to which Italy, Poland, the Czech Republic, Slovakia, Switzerland, and the United States are signatories (Fumagalli Decl. ¶¶ 25–27; Wisniewski Decl. of 5/23/01 ¶¶ 28–31; Sodomka Decl. ¶¶ 25–30; Havlat Decl. ¶¶ 20–24; Vischer Decl. of 11/20/97 ¶¶ 39–40), is an adequate means to compel documents and witness testimony from abroad in this country and elsewhere. Numerous courts have held that the use of international letters rogatory is a viable alternative to *forum non conveniens* dismissal. *See R. Maganlal,* 942 F.2d at 169; *In re Lloyd's Am. Trust Fund Litig.,* 954 F.Supp. 656, 674 (S.D.N.Y.1997); *Anglo Am. Ins. Group., P.L.C. v. CalFed Inc.,* 940 F.Supp. 554, 564 (S.D.N.Y.1996); *Transway Shipping Ltd. v. Underwriters at Lloyd's,* 717 F.Supp. 82, 83–84 (S.D.N.Y. 1989). With respect to Austria and Hungary, which are not signatories to the Convention, defendants' foreign law experts have indicated that requests for information from those countries will generally be honored. In Austria, "[i]t is general practice ... to comply with foreign requests for judicial assistance even in the absence of a treaty." (Kodek Decl. ¶ 41)[12] Hungary, like Austria, generally will "provide judicial assistance to American courts on the basis of reciprocity, in the absence of a judicial assistance agreement." (Hajdu Decl. ¶¶ 27–32)

Finally, that witnesses reached through the Hague evidence-gathering process cannot be forced to give live testimony before this court is not compelling. First, defen-

dants have not even established that those witnesses will be unwilling to travel voluntarily to this district. *See Bravo Co. v. Chum, Ltd.,* 60 F.Supp.2d 52, 57–58 (E.D.N.Y.1999); *Manela v. Garantia Banking Ltd.,* 940 F.Supp. 584, 592–93 & nn. 14–15 (S.D.N.Y.1996); *Flynn v. Gen. Motors, Inc.,* 141 F.R.D. 5, 10 (E.D.N.Y. 1992). Furthermore, although live testimony is generally preferable, *see supra* p. 360, the need for live testimony is less compelling in this case than in many others because the credibility of the various witnesses defendants plan to call is not the threshold issue. *Cf. Alfadda,* 159 F.3d at 48 (holding that live testimony was essential in a fraud case to allow "the trier of fact [to] assess the witnesses' demeanor"); *Howe v. Goldcorp Invs., Ltd.,* 946 F.2d 944, 952 (1st Cir.1991) (holding that live testimony is especially important where "fraud and subjective intent are elements of the claim"); *Schertenleib,* 589 F.2d at 1165 (holding that live testimony is essential where the crux of the litigation is "the truth or falsity of defendant's charges that plaintiff is a swindler"). In this case, both parties' greatest challenge will likely be finding witnesses with any knowledge at all of the insurance policies in question; the credibility of those witnesses will not necessarily be the basis on which plaintiffs' claims rise or fall.

b. *Ability to Implead Third Parties*— In addition to evidentiary concerns, defendants allege that they will be prejudiced by not being able to implead crucial third-party defendants located in Europe because of personal jurisdiction problems and the Foreign Sovereign Immunities Act. (Defs.' *Cornell* Mem. of 11/21/97 at 25–26; Defs.' *Winters* Rep. Mem. of 12/15/99 at 17–18) Although this obstacle

---

**12.** Although Generali's expert states that an Austrian court would have no ability to compel production of those documents (Kodek Decl. ¶ 42), he seems also to indicate that these documents could not be compelled in an Austrian court either (Kodek Decl. ¶¶ 35–36).

also favors dismissal, it too is not compelling. *See Goodyear Tire Co. v. Germanischer Lloyd, Volkswagen de Mexico, S.A. v. Germanischer Lloyd,* Nos. 90 Civ. 1248, 90 Civ. 1298, 1991 WL 230622, at *4 (S.D.N.Y. Oct.29, 1991) ("Although the benefits of impleader may be taken into account in deciding whether a forum is inconvenient, these benefits, alone, are not so important as to overcome the balance of the other Gilbert factors.") (citing *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 379 (2d Cir.1972)).

Impleader is not a great concern in this case because, even if defendants are forced to litigate here and could not implead various Eastern European governments and state-run insurance agencies, they could still offer nationalization as a defense to plaintiffs' claims and could bring a subsequent action for contribution or indemnification against third parties in Europe. *See Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F.Supp. 1003, 1012 (D.N.J.1996); *Volkswagen de Mexico,* 1991 WL 230622, at *4. Being forced to litigate the nationalization issue separately would not be prejudicial because the question whether Zurich and Generali reneged on contractual obligations to plaintiffs and their heirs is conceptually separate from the question whether several Eastern European governments should be liable to defendants for assets nationalized in the post-war era. *See Oliva v. Pan Am. Life Ins. Co.,* 448 F.2d 217 (5th Cir.1971) (rejecting the notion that the nationalization of assets might excuse an insurer of its obligation to insureds); *Pan–Am. Life Ins. Co. v. Blanco,* 362 F.2d 167 (5th Cir.1966) (same). The two issues are related in that defendants' nationalized assets might have

been used to fulfill any obligations to plaintiffs, but the evidence relevant to each issue will be different. Defendants would not be disadvantaged by being forced to litigate the issues separately. *See Olympic Corp.,* 462 F.2d at 379 ("[T]he difference in the legal issues ... is such that it is unlikely that a separate trial of the matters will produce inconsistent results."), *cited in Lehman v. Humphrey Cayman, Ltd.,* 713 F.2d 339, 343–44 (8th Cir.1983) ("[I]t is not likely that separate trials of the claims would require much duplication of proof or result in inconsistent judgments.").

c. *Enforceability of a Class Action Judgment Abroad*—Defendants are also concerned, with respect to the *Cornell, Schenker, Smetana,* and *Haberfeld* class actions, that any class-action judgment in the United States will not be given preclusive effect in European courts.[13] (Fumagalli Decl. ¶ 39; Wisniewski Decl. of 5/23/01 ¶¶ 40–41; Sodomka Decl. ¶¶ 37–38; Hajdu Decl. ¶¶ 42–43; Kodek Decl. ¶¶ 45–48; Vischer Decl. of 11/20/97 ¶¶ 49–50) Defendants fear that even if they litigate and win a judgment in this forum, the unnamed members of the losing class could simply relitigate their claims in various European courts. *Cf. Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 996 (2d Cir. 1975) ("[I]f defendants prevail against a class they are entitled to a victory no less broad than a defeat would have been."). However, defendants' argument does not weigh heavily in the balance at this point in the litigation because it is not yet clear who will comprise the plaintiff class or classes.

To the extent that the putative class in each of these four class actions encompasses only U.S. residents, defendants' concerns are unpersuasive.[14] It is neither

---

13. Defendants make this argument only with respect to the four class action lawsuits. (Defs.' *Cornell* Mem. of 11/21/97 at 22–23; Defs.' *Winters* Rep. Mem. of 12/15/99 at 15–17; Generali Mem. of 5/25/01 at 34).

14. Every named plaintiff in the four class actions is a U.S. resident. The *Smetana* complaint expressly limits its putative class to either American or California residents. (*Smetana* Compl. ¶ 9–10) The *Haberfeld* com-

remarkable nor significant that a class action judgment by a U.S. court will not be enforced in Europe against unnamed members of an exclusively U.S. plaintiff class. Because most European courts do not recognize the class action as binding against unnamed plaintiffs, there will always be the remote possibility, in an American class action against a European company, that some unnamed American class members who lose in the United States will travel to Europe to relitigate their claims. Nonetheless, defendants point to no case in which a class of exclusively U.S. plaintiffs has had their suit dismissed because of this remote possibility. This is not surprising because to dismiss on that basis would be essentially to eliminate the class action procedure as a viable tool for a U.S. plaintiff class attempting to sue a corporation subject to suit in Europe. *See Ansari v. New York Univ.*, 179 F.R.D. 112, 116 (S.D.N.Y.1998) ("This is usually not an issue when the class members are United States citizens, as courts in this country recognize the preclusive effect of a fairly noticed class action suit."); *see also Bersch*, 519 F.2d at 996–97 (directing the district court to "eliminate from the class action all purchasers other than persons who were residents or citizens of the United States," in order to solve the problem of unenforceability of class action judgments in Europe).

To the extent that the plaintiff classes in this action, particularly in *Cornell* and *Schenker*, may include foreign plaintiffs, defendants' concerns are well-founded. However, it would be imprudent to give weight to those concerns until the named plaintiffs, particularly in the *Cornell* and *Schenker* actions, define more precisely

which "persons similarly situated" they intend to include, and how many of these persons, if any, are expected to be foreign nationals. Should it turn out that the *Cornell* and *Schenker* plaintiffs intend their classes to include a sizable number of foreign residents, then that is a factor that may have to be addressed, and can be addressed in subsequent proceedings regarding class certification. In two past cases, I have found that it would be unfair to certify a class with a significant European membership, in part because that class would not be precluded from litigating abroad in their home countries should they lose in this forum. *See Ansari*, 179 F.R.D. at 116–17; *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 127 F.R.D. 454, 459–60 (S.D.N.Y.1989); *see also Bersch*, 519 F.2d at 996 n. 47 (noting the problem of notice in foreign languages in a multinational class action). I will give full consideration to the issue of enforceability should it arise in the future with respect to this consolidated action. However, it would be inappropriate to give weight to the issue at this point in the litigation because, should plaintiffs limit their class to U.S. citizens, defendants' concerns will evaporate.

d. *Other Practical Problems*—At the same time that defendants have described several mildly inconvenient aspects of litigating in this forum, plaintiffs have made a strong showing that refiling their claims in seven different, mostly Eastern European forums would drive up costs to both parties and seriously endanger their ability to press their claims.

Plaintiffs have already spent time and money fighting Generali's motions to remove cases to federal court and to consoli-

plaint defines its class to include "all residents of the State of California who have received [ICHEIC] Form Letters on Holocaust-era insurance claims from Generali" (*Haberfeld* Compl. ¶ 48), and therefore also

seems to encompass only U.S. residents. The intended scope of the *Cornell* and *Schenker* classes is less clear and may reach international litigants, the consequences of which I address below.

date cases in this district before via the MDL panel, only to have defendants now argue that this district is not a convenient forum. In one of Generali's several motions before the MDL panel to consolidate the present cases in this district, Generali argued that "the Actions [now before this court] involve common factual questions, and ... overlapping issues of law," and that therefore, "coordinate or consolidated pretrial proceedings in one judicial district are necessary." (Swift Decl. Ex. E (Generali Mot. for Transfer of 8/11/00 at 6)) Generali cautioned that if the cases were not consolidated, separate proceedings would cause the following expensive inconveniences: inconsistent pretrial rulings, needlessly duplicative discovery and discovery disputes, and conflicting class determinations. (*Id.*) Defendants now eschew these arguments and assert: (1) that plaintiffs' claims involve separate factual issues (Defs.' *Winters* Rep. Mem. of 12/15/99 at 19 ("there is no basis for trying together unrelated claims against unrelated defendants")); (2) that it will be expensive and inconvenient for them to litigate in this forum (*id.* at 12–15; 18–20); and (3) that it would be more convenient to once again divide plaintiffs' claims so that they can be litigated in seven different far-off European forums (*id.* at 18–20 ("plaintiffs' wish to have all defendants before one court should be given no weight in balancing the parties' conveniences")).

Given defendants' inconsistent representations, I am skeptical that dismissal would really be more convenient for their purposes. *See DiRienzo II*, 294 F.3d at 29 (raising "questions as to [defendants'] underlying motives," where defendants had previously moved before the MDL panel to transfer cases to the allegedly inconvenient district). Even taking into account the concerns that defendants have expressed with regard to international evidence gathering, third-party impleader, and the enforceability of judgments, litiga-

tion abroad would seem to be at least as inconvenient and expensive as litigation here. Defendants have already hired lawyers in this country who have been dealing with this litigation in various capacities for over five years. If defendants' motion is granted they will be forced to hire seven new lawyers to defend in each of at least seven countries. *See In re Air Crash Off Long Island*, 65 F.Supp.2d 207, 217 (S.D.N.Y.1999) (denying dismissal where "[p]laintiffs and their attorneys ... [had] already invested time and money on discovery, independent investigations, experts, consultants, and pretrial proceedings" and where the advantage of "resolving all disputes ... in a single forum" would be lost). Common witnesses will have to testify at least seven different times, defendants will have to translate and reproduce commonly applicable documents seven times, and defendants' new lawyers will have to make duplicative trial motions in each of the alternative European forums. With the exception of Italy and Switzerland, litigation in any of the other countries that defendants recommend would not eliminate the need to litigate in a foreign country and language unfamiliar to many of defendants' employees.

Defendants' motions to dismiss may not be based so much on the increased convenience dismissal would offer to them, but rather based on the severe inconvenience that it would work upon plaintiffs in this case. While defendants have offices in the United States, and are therefore quite familiar with this forum, plaintiffs have no connection to the various relevant European jurisdictions. *See Bodner*, 114 F.Supp.2d at 132 (denying a *forum non conveniens* motion where "plaintiffs live within the jurisdiction and would have difficulty traveling to France," but defendants were "large banking institutions that maintain offices and transact business in

the United States and specifically New York City"). Trial in Europe would force plaintiffs, many of whom are elderly, and many of whom likely will be witnesses, to travel to Europe to prosecute their claims in person—a great burden, even assuming that plaintiffs could afford such an effort.

Plaintiffs would also have to hire new lawyers to refile each of their claims in seven different separate European countries. The argument that plaintiffs would have to hire only one new lawyer to appear in each action as local counsel (Defs.' *Winters* Rep. Mem. of 12/15/99 at 8) is ridiculous. Plaintiffs' current lawyers are not qualified to make trial decisions in a Slovakian court or in any of the other civil-law jurisdictions that defendants suggest. *See Massaquoi v. Virgin Atl. Airways,* 945 F.Supp. 58, 63 (S.D.N.Y.1996) (denying a *forum non conveniens* motion in part because of the need to obtain foreign counsel familiar with a foreign legal system). Many of the skills of plaintiffs' current lawyers would be wasted in European civil-law systems which do not provide for pretrial discovery. (Mattei Decl. ¶ 8.c)

The need to rely on local counsel is also significant because plaintiffs have presented evidence that they would be barred from making a contingency fee arrangement with lawyers in Switzerland and Italy. (Mattei Decl. ¶ 5.a; Siehr Decl. ¶ 9) Although plaintiffs have not submitted evidence with respect to the other European forums presently under consideration, "contingency fees are not found in most foreign jurisdictions." *In re Union Carbide Corp. Gas Plant Disaster,* 634 F.Supp. 842, 851 (S.D.N.Y.1986). The almost certain unavailability of contingency fees weighs against dismissal. *See Lehman,* 713 F.2d at 345–46; *Bodner,* 114 F.Supp.2d at 132; *McKrell v. Penta Hotels (France), S.A.,* 703 F.Supp. 13, 14 (S.D.N.Y.1989); *Agyenkwa v. Am. Motors Corp.,* 622 F.Supp. 242, 245 (E.D.N.Y.

1985). The absence of a class action procedure in most European forums is also likely to drive up plaintiffs' costs as to each individual claim, a factor that in this case weighs against dismissal. *See In re Philip Sers. Corp.,* 49 F.Supp.2d at 639 (stating that the increased expense of bringing suit in an alternative forum without an identical class action procedure, though irrelevant to the adequacy of the forum, may be a relevant private interest factor), *rev'd on other grounds, DiRienzo I,* 232 F.3d 49; *Trafton v. Deacon Barclays de Zoete Wedd Ltd.,* No. C 93–2758–FMS, 1994 WL 746199, at *13 (N.D.Cal. Oct.21, 1994) (holding that such increased expense is a relevant private interest factor).

In light of all the above factors, plaintiffs' contention that being forced to litigate in Europe would be the death knell for their claims may not be an exaggeration. *See Irish Nat'l Ins. Co. v. Aer Lingus Teoranta,* 739 F.2d 90, 91 (2d Cir.1984) (holding that *forum non conveniens* dismissal is inappropriate where trial in alternative forum will realistically never occur); *Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d 62, 67 (2d Cir.1981) (same); *McKrell,* 703 F.Supp. at 14–15 (same). "It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit." *Manu Int'l,* 641 F.2d at 65. This risk is particularly strong in this case, in which twelve different actions have been filed and consolidated in this court as part of legal proceedings that have been underway for over five years. A *forum non conveniens* dismissal would involve splitting up this consolidated action—which involves common facts and legal issues—into at least seven different cases and moving those cases into seven different foreign legal systems for proceedings in seven different languages. The private interest factors in this case thus weigh heavily in plaintiffs' favor.

### 2. The Public Interest Factors in Cases Other than Tabaksman

The public interest factors in this case weigh slightly in plaintiffs' favor.[15] This forum has a stronger localized interest in deciding this controversy, a factor which is only partially diminished by the probable need to apply foreign law.

With respect to the first of the public interest factors—congestion in the courts—this phenomenon is encountered the world over. Plaintiffs have submitted evidence indicating that the courts of at least one European forum (Italy) are congested. (Mattei Decl. ¶¶ 6–8) At the same time, this court has noted that congestion is a "persistent affliction." *See In re Philip Services Corp.*, 49 F.Supp.2d at 642 (quoting *DeYoung v. Beddome*, 707 F.Supp. 132, 139 (S.D.N.Y.1989)) (internal quotation marks omitted), *rev'd on other grounds, DiRienzo I*, 232 F.3d 49. Docket congestion is a factor that weighs neither in favor of dismissal nor retention of plaintiffs' claims in this district.

As far as the local interest in these cases, all potential forums in this case have some interest in the subject matter. The seven European forums under consideration all have an interest because the material events that gave rise to plaintiffs' claims occurred in those countries. Those forums also have an interest in redressing the harms inflicted by the Holocaust, which occurred on European soil. On the other hand, the United States and New York have a strong localized interest in providing relief to their residents, who allegedly have been injured by defendants' wrongful acts during the Holocaust era. "Public Policy favors a forum in which United States citizens may seek to redress an alleged wrong." *Bodner*, 114 F.Supp.2d at 133 (quoting *Am. Home Assurance Co.*, 603 F.Supp. at 642) (internal quotation marks omitted).

However, the interest of this forum in plaintiffs' claims is stronger because New York State has expressed a public policy interest in those claims through the New York Holocaust Victims Insurance Act of 1998 ("HVIA"), N.Y. Ins. L. § 2701 et. seq. (McKinney 2000), whereas the connection between those claims and the relevant European forums relates primarily to 70–year old insurance transactions between deceased emigrants and a multinational insurance conglomerate. The New York HVIA explicitly states that no action concerning Holocaust-era insurance claims arising between 1929 and 1945 shall be dismissed from the New York State courts on the ground of *forum non conveniens* (under N.Y. C.P.L.R. § 327), N.Y. Ins. L. § 2704(b), and it extends the state's statute of limitations on Holocaust-era insurance claims, N.Y. Ins. Law § 2704(a). The statute also imposes reporting requirements on New–York–licensed insurance companies regarding their payment of Holocaust-era insurance claims. N.Y. Ins. Law § 2705.[16] Although the forum-non-

---

**15.** The public interest factors to be considered in a *forum non conveniens* motion are:

the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citing *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839).

**16.** Defendants argue that the HVIA is unconstitutional. (Generali Rep. Mem. of 1/9/02 at 32–33; Zurich Rep. Mem. of 11/30/01 at 11) Defendants cite *Gerling Global Reinsurance Corp. v. Gallagher*, 267 F.3d 1228 (11th Cir. 2001), in which the 11th Circuit held that a Florida Holocaust reporting statute violated due process limits as applied to German entities with only some corporate affiliation to firms doing business in Florida. However,

conveniens provision of the HVIA is not binding on this court, most directly because the N.Y. C.P.L.R. does not govern *forum non conveniens* dismissal in federal court, the provision does expressly indicate the state's desire to commit judicial resources to the litigation of plaintiffs' claims.[17] It is hard to imagine a more clear indication that this forum has a strong public interest in the litigation of plaintiffs' claims than a piece of legislation explicitly stating that interest. *See Red Bull Assocs. v. Best Western Int'l, Inc.*, 862 F.2d 963, 966–67 (2d Cir.1988) (noting the public policy significance of a "clear statutory declaration" that certain types of legal actions are to be encouraged); *Bodner*, 114 F.Supp.2d at 133 (noting, in denial of a *forum non conveniens* motion, that New York State had expressed a public policy interest in Holocaust litigation through the Governor's executive order). In the absence of any similar public sentiment in the alternative European forums under consideration in this case, or a more

tangible present-day connection to the subject matter of plaintiffs' claims, this forum has the stronger public interest in adjudication of plaintiffs' claims.

That this forum has the greater interest in the litigation of plaintiffs' claims is only somewhat diminished by the probable need to apply foreign law. Under New York choice-of-law rules, which govern in a federal diversity case, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), New York substantive law applies unless there is a true conflict requiring a conflicts analysis. *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936 (1993). Given that punitive damages are not available in most civil-law systems, and that the seven civil-law European forums that defendants advocate do not have causes of action identical to those in our common law courts, there would seem to be a need for a choice of law analysis in this case.[18] Under New York's "center of gravity" or "grouping of contacts" approach to conflicts, it seems likely that foreign law will apply to this dispute.[19]

---

the Ninth Circuit has twice affirmed the constitutionality of a Holocaust reporting statute similar to the New York HVIA. *See Gerling Global Reinsurance Corp. v. Low*, 296 F.3d 832 (9th Cir.2002); *Gerling Global Reinsurance Corp. v. Low*, 240 F.3d 739 (9th Cir. 2001). Further, even if the HVIA were unconstitutional, it would still be a persuasive indication of this forum's public interest in plaintiffs' claims.

17. The language of this provision is not limited to New York residents. It applies to "any action ... brought by a Holocaust victim," N.Y. Ins. L. § 2704(b), with a "Holocaust victim" being defined as *"any person ... or other such successor-in-interest of such person, who lost his or her life or property as a result of [the Holocaust],"* N.Y. Ins. L. § 2701 (emphasis added).

18. It is at best inconsistent for plaintiffs to argue that the laws of New York and Europe are not in conflict (*Winters* Pls.' Mem. of 10/18/99 at 58–59), when much of the basis for their opposition to defendants' motion derives from the absence of any guarantee that

their common law claims "would actually apply to Holocaust-related claims" in Europe and the unavailability of punitive damages, which makes European forums "grossly inadequate" (*id.* at 12–13, 20). *See PT United*, 1997 WL 31194, at *10 n. 3 (noting similar inconsistency).

19. *See Matter of Allstate*, 81 N.Y.2d at 226, 597 N.Y.S.2d at 907, 613 N.E.2d 936 (discussing the "grouping of contacts" and "center of gravity" tests); *Evvtex Co. v. Hartley Cooper Assocs. Ltd.*, 911 F.Supp. 732, 738 (S.D.N.Y. 1996) ("In cases involving insurance contracts, important factors considered by New York courts in making [the grouping of contacts] determination include the 'location of the insured risk, residence of the parties, and where the contract was issued and negotiated.' "), *aff'd*, 102 F.3d 1327 (2d Cir.1996); *Johansen v. Confederation Life Ass'n*, 447 F.2d 175, 179 (2d Cir.1971) (holding that for the purposes of a New York conflicts determination, courts should "look to the domicile of the insureds themselves at the time they entered into the contracts, rather than to the

At this stage of the litigation, however, it is unnecessary to resolve choice-of-law questions. *See PT United,* 1997 WL 31194, at \*10; *Flynn,* 141 F.R.D. at 10.

■ Assuming for the purposes of this motion that foreign law applies, that factor still does not outweigh this forum's public interest in the litigation of plaintiffs' claims. Although it is well established that the need to apply foreign law weighs in favor of dismissal, *Piper Aircraft,* 454 U.S. at 260, 102 S.Ct. 252; *Calavo Growers of Cal. v. Generali Belgium,* 632 F.2d 963, 967 (2d Cir.1980); *Schertenleib,* 589 F.2d at 1165; *Fitzgerald v. Westland Marine Corp.,* 369 F.2d 499, 502 (2d Cir.1966), it is equally well established that the need to apply foreign law does not itself mandate dismissal, *see Manu Int'l, S.A.,* 641 F.2d at 67; *Olympic Corp.,* 462 F.2d at 379; *Flynn,* 141 F.R.D. at 10; *Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos,* 712 F.Supp. 383, 393 (S.D.N.Y. 1989). "The task of deciding foreign law is a chore that the federal courts are called upon to perform with regularity." *Ciprari v. Servicos Aereos Cruzeiro do Sul, S.A.,* 232 F.Supp. 433, 443 (S.D.N.Y.1964). Therefore, the need to apply foreign law in this case is not a persuasive basis for dismissal.

Defendants argue, dramatically, that "the relevant [foreign] laws arise in many different nations ..., cover a period of many decades, concern an industry highly regulated under local law, and embrace highly sensitive issues of public policy (such as the impact of claims and payments made under post-war restitution programs)." (Defs.' *Winters* Mem. of 7/30/99 at 9) However, we are dealing here with a lawsuit to enforce insurance policies, not a proceeding to regulate the insurance business in foreign countries. These policies are governed by law in ef-

fect at a particular time, to be determined, not by laws over decades. Further, five of the seven countries at issue in this motion have changed regimes at least twice since the 1930s, and it is not clear that even a foreign court examining plaintiffs' claims would be entirely "at home with the ... law that must govern." *Gilbert,* 330 U.S. at 509, 67 S.Ct. 839; *see* Generali Mem. of 5/25/01 at 22 (noting that in this case, "the applicable foreign laws are more often than not the laws that were in effect more than half a century ago." (citing foreign law experts)). Still further, any public policy issues presented by post-war restitution programs will be no less daunting to foreign courts than to this court. Whatever the forum, historical legal experts likely will be needed to sort out potentially applicable laws. Furthermore, unlike cases in which a strong local interest in regulatory policy is implicated, *see, e.g., Dowling v. Richardson–Merrell, Inc.,* 727 F.2d 608, 616 (6th Cir.1984), the antiquity of many of the laws involved in the present case make it unlikely that any ruling by this court will interfere with the current regulatory regimes that govern modern European insurance law.

Because the public interest factors in this case weigh slightly in plaintiffs' favor, and because, as discussed above, the private interest factors weigh more heavily in plaintiffs' favor, the balancing of the conveniences in this case does not require dismissal, particularly in light of the strong deference due plaintiffs' choice of forum. Generali and Zurich's motions to dismiss are therefore denied with respect to all plaintiffs. Plaintiff Tabaksman's case is analyzed immediately below.

*3. Plaintiff Tabaksman*

■ Plaintiff Tabaksman is entitled to considerably less deference in his choice of

domicile of the plaintiffs at the time of bring- ing suit.").

forum than the other plaintiffs in theirs because he is a British citizen. *See supra* p. 353. However, even given the low level of deference due his choice of forum, the fact that 11 other related Holocaust insurance cases are to be litigated in the district is a convenience factor that tilts sufficiently in his favor to preclude dismissal.

With respect to the private interest factors, Tabaksman's position is weaker than that of the other 11 plaintiffs in this consolidated motion because his case will include no evidence from the United States, and because it is less inconvenient for him to travel to Poland (where his family's insurance policy was issued) than it would be for the other 11 plaintiffs. However, because Generali already will be litigating 11 other consolidated cases in this district, most of the evidence necessary to try Tabaksman's case will already be located here. For example, all evidence relating to Generali's European operations during the Holocaust era as well as any information regarding Generali's branch offices in Poland will already be located in this country because of the *Haberfeld* and *Cornell* actions. The only additional evidence that might be found only in Poland is any evidence specifically related to the Tabaksman policy, which is not likely to be substantial. Litigation in Poland would, however, require both parties to retain new counsel and to operate in an unfamiliar legal system in a foreign language, with all of the attendant inconveniences discussed above. In light of the mass of evidence to be located in this forum with respect to Tabaksman's claims, the private convenience factors weigh at least somewhat in his favor.

The public interest factors do not weigh in Tabaksman's favor. Because Tabaks-

man is not a U.S. citizen, there is little localized interest in his case in this forum, except perhaps for a generalized interest in Holocaust-era insurance litigation expressed by the New York State legislature in the HVIA. *See supra* note 17. Furthermore, as discussed above, it is likely that foreign law will apply to his claims. However, among the public interest factors to be considered is the administrative burden on the court and the unfairness of burdening the citizens of the forum state with jury duty. *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839. There will be virtually no administrative burden in Tabaksman's case because his claim relates to one of 45 insurance policies currently before the court for examination, not to mention the many policies that have yet to be identified in connection with plaintiffs' class action claims. Therefore, even though the public interest factors are not broadly in Tabaksman's favor, that should not be dispositive.

Because of the convenience of trying Tabaksman's claims in conjunction with the other related cases in this consolidated proceeding, and because of the slight burden associated with such an action, defendants' motions to dismiss are denied with respect to plaintiff Tabaksman.

II.

In addition to Generali's and Zurich's motions to dismiss on the ground of *forum non conveniens*, Generali has moved to dismiss in favor of several alternative European forums on the ground that forum selection clauses applicable to plaintiffs' insurance contracts require adjudication of their claims in those forums.[20] Generali cannot locate several of the relevant policies and thus does not assert that a bind-

---

**20.** Zurich has not moved to dismiss on this ground because the company has no evidence that any plaintiff in the *Schenker* action was a Zurich policyholder and, therefore, is "not able to determine whether any relevant policy contained a forum selection clause." (Zurich Mem. of 6/7/01 at 4 n. 3)

ing forum selection clause governs with respect to those policies.[21] However, Generali has located many of the specific policies applicable to plaintiffs' claims and has submitted evidence with respect to forum selection clauses in those policies.[22]

21. Generali has not been able to locate the following policies. In *Schenker:* Sterngast policies, Kunz policies, Gonsher policies, Neuman policies. (Catalanotti Decl. of 5/23/01 ¶¶ 55–58) In *Smetana:* Friedman policy, Oreffice Policies; Oreffice Cavaglieri Polices; Sullam Policies; Maroni Policies. (*Id.* ¶¶ 77–79) In *Lightner:* Goldstein policies 188.543, 11006377. (*Id.* ¶ 90)

22. Generali has located the following 45 policies; any forum selection clauses contained within those policies are noted parenthetically. In *Cornell:* Drucker Policy 108526 ("[c]omplaints . . . shall be filed with the competent court in Prague"); Drucker Policy 110899 (same); Drucker Policy 114004 (same); Drucker Policy 115356 (same); Drucker Policy 118339 (same); Drucker Policy 124637 ("[c]omplaints . . . shall be filed with the competent court at the domicile of the corporation's directorate for the Czechoslovakian Republic in Prague"); Drucker Policy 126959 (same); Herszlikiewicz Policy 619074 ("[a]s the exclusively competent court . . . there is appointed the court in Cracow"); Fekete Policy 56583 ("Any legal questions . . . shall be decided exclusively by the Royal Commercial and Exchange Court of Budapest.") (sample terms); Solti Policy 62940 ("Any legal claims . . . shall be adjudicated exclusively by the competent Budapest Court.") (sample terms); Solti Policy 64135 (same); Solti Policy 86847 ("Any legal cases . . . shall be adjudicated by the Central Royal District Court of Budapest [or] the Budapest Royal Court of Justice.") (sample terms). In *Smetana:* Smetana Policy 570967 ("Any disputes . . . shall be heard by the competent court in [Prague, as amended].") (sample terms); Smetana Policy 105297 ("All disputes . . . shall be properly brought before the court in Prague with subject matter jurisdiction.") (sample terms); Smetana Policy 154817 ("Complaints . . . shall be filed with the competent court in Vienna.") (sample terms); Smetana Policy 121240 ("Complaints . . . shall be filed with the competent court in Prague."); Smetana Policy 131522 ("Complaints . . . shall be filed with the competent court at the domicile of the corporation's directorate for the Czechoslovakian Republic in Prague."); Smetana Policy 138613 (no forum selection clause); Cavaglieri Policy 113801 ("The judiciary of Venice shall have jurisdic-

tion over all disputes arising under this contract.") (sample terms); Cavaglieri Policy 28906 (same); Cavaglieri Policy 60922 (same). In *David:* Schapira Policy 529060 ("All disputes . . . shall be properly brought before the court in Triest[e] with subject matter jurisdiction."). In *Lightner:* Goldstein Policy 132424 ("Complaints . . . shall be filed with the competent court at the domicile of the corporation's directorate for the Czechoslovakian Republic in Prague."). In *Weiss:* Weiss Policy 136371 (same); Birnbaum Policy 140569 (no forum selection clause); Birnbaum Fire Policy ("In any legal disputes . . . the parties hereby assign exclusive jurisdiction to the Royal Central District Court of Budapest or the Royal Court of Justice of Budapest . . . ."); Moldavia Fire Policy ("In any legal disputes . . . the parties hereby assign exclusive jurisdiction to the District Court of Bratislava [or] the Bratislava Municipal Court . . . ."). In *Szekeres:* Szekeres Policy 563052 ("all legal cases . . . shall be adjudicated by the Central Royal District Court of Budapest [or] the Budapest Royal Court of Justice") (sample terms); Szekeres Policy 50008 (same); Szekeres Policy 58777 ("Any legal questions . . . shall be decided exclusively by the royal Commercial and Exchange Court of Budapest.") (sample terms); Szekeres Policy 65335 ("Any legal claims shall be adjudicated exclusively by the competent court in Budapest") (sample terms); Szekeres Policy 79435 ("Any legal case . . . shall be adjudicated by the Central Royal District Court of Budapest [or] the Budapest Royal Court of Justice.") (sample terms); Szekeres Policy 84984 ("Any legal cases . . . shall be adjudicated by the Central Royal District Court of Budapest [or] the Budapest Royal Court of Justice"). In *Mandil:* Mandil Policy 720.301 ("Claims . . . shall be filed with a proper court of law in Zagreb."); Mandil Policy 753.575 ("All disputes . . . shall fall under the jurisdiction of a proper court of law in Belgrade") (sample terms); Mandil Policy 753.596 (same); Mandil Policy 754.677 ("Claims . . . shall be filed with a proper court of law in Zagreb.") (sample terms); Mandil Policy 920.111 (same). In *Brauns:* Brauns Policy (no forum selection clause). In *Haberfeld:* Spierer Policy 577056 ("All disputes . . . must be filed with the appropriate court having jurisdiction over the matter in Warsaw.");

The policies that Generali has been able to locate fall into three categories. Of 45 total policies, 22 policies contain forum selection clauses expressly mandating suit in a European forum. An additional 19 policies contain forum selection clauses that Generali believes were included in the original policies, but cannot prove exist because the company has been able to offer only sample terms and conditions from other policies issued around the same time as the original policies. Four of the policies produced do not contain a forum selection clause. *See supra* note 22. However, even assuming that Generali has met its burden of proof with respect to the existence of the 41 forum selection clauses, and assuming that those clauses are mandatory, the clauses are unenforceable for the reasons explained below.

▆▆▆ The enforceability or validity of a forum selection clause is a matter of federal procedural law. *Cronin v. Family Educ. Co.,* 105 F.Supp.2d 136, 139 (E.D.N.Y.2000). A forum selection clause is presumptively valid, and will control "absent a strong showing that it should be set aside." *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 15, 92 S.Ct. 1907, 32

L.Ed.2d 513 (1972). The presumption may be overcome "by a clear showing that the clauses 'are "unreasonable" under the circumstances.'" *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir.1993) (quoting *M/S Bremen,* 407 U.S. at 10, 92 S.Ct. 1907). Forum selection clauses are unreasonable:

(1) if their incorporation into the agreement was the result of fraud or overreaching [citing *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 595, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)]; (2) if the complaining party "will for all practical purposes be deprived of his day in court," due to the grave inconvenience or unfairness of the selected forum [citing *M/S Bremen,* 407 U.S. at 18, 92 S.Ct. 1907]; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy [citing *Shute,* 499 U.S. at 595, 111 S.Ct. 1522]; or (4) if the clauses contravene a strong public policy of the forum state [citing *M/S Bremen,* 407 U.S. at 15, 92 S.Ct. 1907].

*Id.*

▆▆▆ Plaintiffs have not demonstrated that the forum selection clauses produced by Generali are the product of fraud or overreaching[23] or that the relevant Euro-

---

Haberfeld Policy 626685 ("All suits may be heard [at several locations in Poland or in Trieste]."); Haberfeld Policy 629538 (same). In *Tabaksman:* Tabaksman Policy 618448 ("The Court in Warsaw with jurisdiction of the subject matter is [hereby] determined as [the] exclusively competent [venue]"). In *Sladek:* Schlesinger Policy 131054 ("Complaints ... shall be brought before the competent courts at the registered office of the headquarters of the company for the Czechoslovakian Republic in Prague."); Schlesinger Policy 139077 (no express forum selection clause). (Catalanotti Decl. of 5/23/02; Carnicelli Decl. of 1/9/02; Wisniewski Decl. of 10/19/01; Velie Rep. Decl. of 1/8/02 Ex. K.)

23. Plaintiffs argue that the clauses should be unenforceable as the product of overreaching because defendants "specifically induced persecuted individuals ... to purchase insurance

policies," and then were "partly responsible for the persecutees' post-war flight, due to their refusal to honor policies that could have permitted the persecutees to re-build their lives in Europe after the War." (*Winters* Pls.' Mem. of 10/18/99 at 49–50) I am not unsympathetic to this argument, but plaintiffs have not, at this stage of the litigation, presented the evidence necessary to prove these allegations.

The Weiss plaintiffs also argue that their policies contain clauses allowing payment of benefits anywhere in the world, and that it is overreaching for Generali now to assert that those policies cannot be enforced in this forum. (Weiss Mem. at 9–11, 13–14) *See Buxbaum v. Assicurazioni Generali,* 33 N.Y.S.2d 496 (N.Y.Sup.1942) (holding that a Generali policy payable anywhere in the world is enforceable in New York), *cited in Kaplan v. Assicurazioni Generali,* 34 N.Y.S.2d 115

pean forums would be so "fundamentally unfair" as to deprive plaintiffs of a remedy. However, plaintiffs have shown that they may be deprived of their day in court by being forced to litigate in Europe, and that litigation of their claims abroad is contrary to the public policy of this forum. The weight of that showing, combined with the fact that the parties to the original insurance contracts in this case could not knowingly have consented to jurisdiction in the courts of Poland, Italy, the Czech Republic, Austria, Slovakia, and Hungary as constituted in the year 2002, yields the conclusion that enforcement of the applicable forum selection clauses would not be reasonable.

Plaintiffs have made a strong showing that they would be greatly inconvenienced by being forced to litigate their claims in several different European countries, and that it might be impossible to prosecute their claims. *See supra* pp. 364–66. Plaintiffs note their lack of connection to the European forums defendants advocate, the difficulty of travel for elderly plaintiffs, the need to hire at least seven new foreign lawyers, their inability to pay for such representation through a contingency fee arrangement, and the loss of economies of scale associated with their inability to consolidate their cases or utilize the class action procedure. *See id.* Equally important, the extent of plaintiffs' present-day inconvenience was not foreseeable to the parties at the time of contracting. These inconveniences were caused by the Holocaust. This factor cannot be said to have been reflected in the relevant insurance agreements. *Cf. M/S Bremen,* 407 U.S. at 17–18, 92 S.Ct. 1907 ("Whatever 'inconvenience' [respondent] would suffer ... was clearly foreseeable at the time of contracting.").

Although "mere inconvenience and expense of traveling are not themselves adequate reasons to disturb the parties' contractual choice of forum," *Strategic Mktg. & Communications, Inc. v. Kmart Corp.,* 41 F.Supp.2d 268, 274 (S.D.N.Y.1998), *quoted in Fennell Ave. LLC v. America's Senior Fin. Servs., Inc.,* No. 00 Civ. 6214, 2001 WL 46994, at *2 (S.D.N.Y. Jan.19, 2001), enforcement of the forum selection clauses in this case would also be against the public policy of this forum, which favors litigation of plaintiffs' Holocaust-related insurance claims in this district. As discussed above, the New York HVIA has specifically expressed the legislature's preference that actions such as this be litigated locally in order to protect the state's "clear and substantial interest in ensuring that justice is effected for New York citizens." HVIA § 2, N.Y. Ins. Law § 2701 notes; *see supra* pp. 367–68.

In a similar case in California, a Court refused to give effect to a forum selection clause in a Generali policy, in part because of the California Holocaust Victims Insurance Recovery Act ("HVIRA"). *See Stern, et al. v. Assicurazioni Generali, et al.,* No. BC 185376, 1999 WL 167546, at *1–2 (Cal App.Super. Jan. 25, 1999) (unpublished opinion). The HVIRA vests jurisdiction over Holocaust insurance cases in the California state courts, "[n]otwithstanding any other provision of law" and "irrespective of any contrary forum selection provision contained in the policies themselves." Cal. Civ.Proc.Code § 354.5 & notes (West 2002). However, in reaching its decision, the Court did not rely on the terms of the California statute itself, but rather held that "[i]n the face of the strong public policy in favor of California's jurisdiction," it would not honor the forum selection

---

(N.Y.Sup.1942) (same). This argument, too, has some merit, but because such a payment clause was present in only some of the insur-

ance policies presently at issue, I decline to address this argument in favor of more broadly applicable reasoning.

clause. *Stern*, 1999 WL 167546, at *2. Similarly, in this case, it is not the New York HVIA itself that makes the forum selection clauses unenforceable, but rather the strong public policy it reflects.

The *Stern* case is analogous to several federal civil rights cases that have held that public policy, as expressed in a statute, may require invalidation of a forum selection clause. In *Red Bull Associates v. Best Western International, Inc.*, 862 F.2d 963 (2d Cir.1988), the Second Circuit affirmed the district court's conclusion that "Congress' basic purpose in incorporating the concept of the private attorney general into the civil rights laws was to encourage litigation of civil rights claims," and that "that public policy would obviously be hindered by enforcing a [forum selection] contract which would prevent or seriously discourage the pursuit of such litigation." *Id.* at 966 (quoting *Red Bull v. Best Western Intern.*, 686 F.Supp. 447, 452 (S.D.N.Y. 1988)); *see also Walker v. Carnival Cruise Lines*, 107 F.Supp.2d 1135, 1144–45 (N.D.Cal.2000) (collecting cases). The New York HVIA and the federal civil rights laws both serve to encourage private lawsuits aimed at remedying the ill effects of past racial, ethnic, and religious discrimination. Such a purpose may trump the language of a privately negotiated forum selection clause in circumstances like those presented in the instant cases.

The result generated by conventional *forum non conveniens* analysis appears more appropriate here than it might be in other cases because it is impossible to conclude in many instances in this case that enforcing a forum selection clause would accurately reflect the expectations of the parties to the original insurance agreements. A forum selection clause allows parties to eliminate uncertainties "by agreeing in advance on a forum acceptable to both parties," *M/S Bremen*, 407 U.S. at 13–14, 92 S.Ct. 1907. Enforcement serves

to "give effect to the legitimate expectations of the parties." *Id.* at 12, 92 S.Ct. 1907. Because the present-day European forums specified in the forum selection clauses in this case are so materially different from the forums in which the parties agreed to litigate between 1912 and 1941, enforcement of those clauses could not reasonably fulfill the "expectations of the parties," and therefore would be unreasonable under the circumstances.

As indicated above, the Generali insurance policies relevant to plaintiffs' claims were all issued sometime between 1912 and 1941, with forum selection clauses mandating litigation in the courts of Austria, Czechoslovakia, Italy, Poland, Hungary, or Yugoslavia. *See supra* note 22. The one thing that each of those countries has in common is that each, even ignoring the chaos of World War I, has changed regimes at least once, and some several times, since 1935.

Many of the forum selection clauses at issue in this case make clear that the parties did not contemplate the impending turmoil in Europe when they entered into the insurance policies at issue in this case. For example, Drucker Policy 124637, issued in 1931, states that "[c]omplaints ... shall be filed with the competent court at the domicile of the corporation's directorate for the Czechoslovakian Republic in Prague." (Catalanotti Decl. of 5/23/01 ¶¶ 34–35, Ex. F) The parties seem clearly not to have provided for the contingency in which Czechoslovakia would no longer be a republic, Generali would no longer have a directorate in Czechoslovakia because all of its assets were nationalized, Drucker's heirs would no longer be living in the country due to a systematic campaign of extermination, and the country would choose to divide itself into the separate Czech and Slovak Republics. Similarly, Szekeres Policy 84984, issued in 1938,

states that "[a]ny legal cases ... shall be adjudicated by the Central Royal District Court of Budapest [or] the Budapest Royal Court of Justice." (Catalanotti Decl. of 5/23/01 ¶¶ 115–117, Ex. FF) However, the parties to the Szekeres Policy seem clearly not to have contemplated that the Central Royal District Court of Budapest would no longer exist because of years of communist domination. Rather, the language of many of the relevant policies makes clear that the parties to each of those insurance contracts intended to specify a particular forum, associated with a particular government during a particular time period. The subsequent emergence of the Czech Republic and Hungary as democratic regimes in the 1990's, although a welcome geopolitical development, does not validate the notion that litigation in the modern-day courts of those countries is what the parties had in mind back in the 1920's and 30's. Even for those forum selection clauses that are more vague, the question of the parties' forum expectations after decades of turbulent history is problematic.

Nonetheless, there is little case law in support of the proposition that a change in regime may render a forum selection clause unenforceable, at least where the adequacy of the courts of the new regime is not in question. Several Courts have held that forum selection clauses dictating litigation in Iran would not be enforced after Iran's Islamic revolution in 1979; however, those Courts were heavily influenced by the inadequacy of Iran as a fair and impartial forum. *See McDonnell Douglas Corp. v. Islamic Republic of Iran,* 758 F.2d 341, 345–46 (8th Cir.1985); *Rockwell Int'l Sys., Inc. v. Citibank, N.A.,* 719 F.2d 583, 587–88 (2d Cir.1983); *Continental Grain Export Corp. v. Ministry of War–Etka Co. Ltd.,* 603 F.Supp. 724, 729 (S.D.N.Y.1984). In a more closely analogous case, *Thermal Material Systems, Inc. v. Valmiera Glass Fibre Plant,* No. C 97–

0075 EFL, 1997 WL 351094 (N.D.Cal. June 17, 1997), the Court held that a forum selection clause in a distribution agreement mandating litigation in the "Latvian Economy Court" would be enforced, even after the jurisdiction of that court passed to Latvia's three-tiered judicial system in the wake of Latvia's post-Soviet independence. *Id.* at *1. However, *Thermal Material Systems* is distinguishable from this unique case in which 70 years have passed since the forum selection clauses were agreed to; in which several of the countries in question have changed regimes multiple times; and in which neither plaintiffs nor defendants had any presence in many of the specified forums for over 50 years. Applying conventional *forum non conveniens* analysis, and mindful of the circumstances in this case, the inconvenience that plaintiffs would face litigating in Europe, and New York's public policy favoring the adjudication of Holocaust-era insurance disputes in this forum, I can see no justification for enforcing the forum selection clauses.

\* \* \* \* \* \*

For the reasons explained above, Generali's and Zurich's motions to dismiss on the ground of *forum non conveniens* are denied with respect to all plaintiffs, and with respect to both ICHEIC and the relevant European forums where plaintiffs' claims arose. In addition, Generali's motion to dismiss on the ground of contractual forum selection is denied because the applicable forum selection clauses are not enforceable. The court will contact the parties to set a conference to schedule further proceedings in this consolidated action, including but not limited to discovery. Counsel are directed to confer prior to that conference, with respect to a schedule for discovery and other pretrial procedures, and to

be prepared to fix such a schedule at that conference.

SO ORDERED.

